(84 South. 29)

No. 23859.

STATE v. VAN DUFF.

(March 1, 1920.)

*(Syllabus by Editorial Staff.)*

1. HOMICIDE ⚖=156(1) — TESTIMONY OF DEFENDANT TENDING TO REBUT INFERENCE OF JOURNEY WITH CRIMINAL INTENT RELEVANT.

In a prosecution for killing defendant's father-in-law, in view of the testimony that defendant, while riding in an automobile toward his father-in-law's home, had stated that the price of the ride was possibly the last dollar he would ever pay the driver, at least for 20 years, testimony of defendant that his wife's brother had come to him the same day with a message from his wife to come to her father's and get her, the brother being offered as a witness in corroboration, was relevant and improperly excluded.

2. HOMICIDE ⚖=188(4)—TESTIMONY OF TURBULENT CHARACTER OF DECEASED INADMISSIBLE AS WITHOUT SUFFICIENT BASIS.

In a prosecution for killing defendant's father-in-law, in view of defendant's statement that he had killed to save his wife, and of other contradictory statements of defendant, and all the circumstances, evidence of the domineering, turbulent, violent, determined, and dangerous character of the father-in-law, and of threats made by him against defendant, *held* inadmissible as without sufficient basis, the conduct and attitude of deceased being shown only by defendant's testimony that deceased provoked the fatal difficulty, which, if believed, was a sufficient defense.

O'Niell, J., dissenting in part.

Appeal from Tenth Judicial District Court, Parish of Concordia; N. M. Calhoun, Judge.

One Van Duff was convicted of manslaughter, and he appeals. Judgment set aside, and case remanded.

Hugh Tullis, of Vidalia, and E. H. Ratcliff, for appellant.

A. V. Coco, Atty. Gen., and Jos. M. Reeves, Dist. Atty., of Vidalia (Dale, Young & Dale, of Vidalia, and T. S. Wamsley, of New Orleans, of counsel), for the State.

PROVOSTY, J. Accused was tried for manslaughter, was convicted, and has appealed.

The deceased, whose age is variously stated at from 68 to 80, lived several miles out in the woods on the bank of Bayou Cocodra, with his wife, considerably older than he, as we gather, and their daughter Emma, whose age is not otherwise fixed in the record than by her statement that she was older than her sister, who had been married 17 years. The accused had lived at the house of the deceased for 11 months when he and the daughter Emma married. They went to Vidalia for that purpose, because the father would

have opposed the marriage; and they went to live some 18 miles away, where the accused earned a living by cutting timber in the employ of a sawmill company. The marriage took place on April 28th. On May 21st the father appeared and asked the daughter to come to her mother, who was ill, and the daughter went; first, however, enjoining her husband to come for her on the following Sunday. He did so. On reaching the place he went into the room where she was, and, they being alone in the room, she pointed to a chair, and asked him to be seated, and said:

"I have found that I have made a mistake. And I told her that I was sorry that she had made a mistake, and at that point I got up and told her good-bye," and came away.

But, suspecting that his wife had been led by some hidden reason to say this, he, on the following Saturday, went to his wife's sister to find out what was the trouble, and—

"she told me that she could not tell me, because if she did and Mr. Blount found out that she told it that she could not, as he would come out there and kill her."

Then, on the Monday after this Saturday, he went to Jim Blount's, the brother of his wife.

"I went down there to ask Jim Blount what was the trouble; what was the matter that my wife could not talk to me or get away from there; and he told me, he says, 'It is just a miracle that you got away from there the Sunday you went away from there alive;' and he said, 'Don't go there any more. I want to tell you he is no common man, and you know it.'"

On that same day he met the other brother, Howard Blount.

"He told me that 'Things are mighty bad at home and they are in a jam;' and says, 'Whatever you do, don't go down there at all; not until you hear from some one of them.'"

On the following Thursday, the day before the homicide Howard Blount came to the house of accused, and, says accused:

"He told me that it was a dangerous thing to go down there, and he said, 'I want you to remember it is dangerous for you to go down there, but Emma says for you to come and get her, and if you would not come and get her that she could not live where she was at.'"

Complying at once with that request, he reached the place in the nighttime. He remained under a tree on the bayou bank in front of the house until shortly before daylight, and then went into a boathouse which the receding high water had left there on the top of the bayou bank. From that station he saw the deceased come out of the house and go down the bayou bank, about 45 feet from the boathouse, and set about building a fire under a large pot such as is used for boiling clothes. Stealing then from that side of the boathouse towards the house, so that, as he did so, the boathouse was between him and the old man down the bayou bank, accused went to and into the house, and as he entered set down his gun, which he had brought with him by the door. His wife, who was in the kitchen, saw him coming up the steps and ran to meet him, and after they had embraced and kissed told him that if her father saw him there he would kill them both. To which he answered, "Oh, he won't do that;" and immediately turned and walked out, taking up, as he passed the door, the rifle of the deceased, which was there—a very potent weapon, it seems. He says that his taking this rifle instead of his gun was simply through inadvertence, in his excitement. He went straight to the bayou bank where the deceased was. He says that his idea was to get away without being seen by the deceased, and says also: "I wanted to know why he was mad with me, and why he wanted to do me as he had said." Accused says that when he became aware that the deceased had seen him he went towards him to talk to him; that when he got about 8 feet from deceased the latter began cursing, and took up an ax and came towards him, mad, looking like a

wild man, and saying, "I am going to kill both you and Emma;" whereupon, he (accused) fired, because deceased "looked as if he was going after a gun" (meaning reaching for a pistol), and because "he could have hit me with that ax." To the question, "Could you not have gotten away?" accused answered: "I don't see how I could. When he made that run at me, you see, he got my nerves all torn to pieces. I could do nothing." The wife remained in the house, and did not see what took place, but, hearing a shot, screamed, and a neighbor, hearing two shots and the screams, came as fast as he could, and saw accused, who had come part of the way to call him, and saw the deceased dead on the slope of the bayou bank. One shot had carried off the top of his head; it had come from behind; the other shot had fractured his thigh. The second shot had followed the first so closely that the wife took them for one shot. The accused says he fired as fast as he could "work the lever."

The livery man at Vidalia, Mr. Nagle, in whose automobile the accused rode the evening before, on his way out to Bayou Cocodra, testified, as a witness for the state, as follows:

"He said that he was going after his wife and he intended to get her, and as he left my car and got out of the car and paid me the $1 for the car, he said, 'Possibly this is the last $1 I will ever pay you, or at least for 20 years;' and I said, 'You do not intend riding in this car any more?' and I asked him what he meant and he says—at least he did not make any satisfactory reply. I said, 'I advise you to get in my car and come back to town;' but he kept on going."

[1] This evidence, which showed that accused at that time anticipated some event which would preclude him, either forever or for 20 years, from riding in the automobile of the witness—which could hardly be understood as meaning anything else than that the speaker would be killed, or would by killing some one bring upon himself a 20-year term of imprisonment—was most damaging to accused; for it went to show that his mission was to seek out his father-in-law and either kill him or be killed by him.

To counteract this evidence accused offered to testify to the brother of his wife, Howard Blount, having come to him that same day with a message from his wife to come and get her, and offered this brother as a witness in corroboration; and this evidence was objected to as being irrelevant, and was excluded.

To our mind it was clearly relevant.

And highly important. For, under the peculiar circumstances of the case, said evidence tended to show premeditation, or express malice, on the part of the accused; and, while it was no doubt not offered for that purpose, since malice was not an element in the case—the charge being manslaughter, and not murder—but only for the purpose, doubtless, of showing that most probably accused had been the aggressor after the two men had come in presence, there was danger that the jury might accept that evidence as showing intention on the part of accused to seek out the deceased, and either kill or be killed by him.

The case of the accused bears a sufficiently ugly look as it is, without his being denied the benefit of this additional light upon his motive.

True, he was allowed to testify that he knew that his wife wanted him to come for her, and that his object in going out to his father-in-law's place was to get her; but between a vague statement of that kind and the precise testimony that on that very day he had received a special message from his wife, and through her brother at that, there is quite a difference in respect to the impression likely to be produced upon the jury.

After the homicide the accused went directly and delivered himself up to the sheriff;

and, in answer to a question by that officer why he had killed Blount, answered that it had been "to save his wife."

[2] In view of that statement, and of the other contradictory statements of the accused, and of all the circumstances of the case, the learned trial judge was of opinion that no sufficient basis had been laid for the introduction of evidence of the domineering, turbulent, violent, determined, and dangerous character of the deceased, and of threats made by him against the accused. The learned counsel for accused think that this ruling was erroneous, in view of the decision of this court in State v. Pairs, 145 La. 444, 82 South. 407. In that case the conduct, or attitude, of the deceased was a hostile demonstration or not, accordingly as threats had been made or not, and proof of the threats was allowed for elucidating the situation. In the present case the conduct, situation, or attitude of the deceased is not shown, except by the testimony of the accused himself; and if that testimony is believed on the point of whether a predicate was laid or not, the situation needs no further elucidation; indeed, if the accused is believed, the defense needs no further evidence.

The other bills of exception need not be considered, as they relate to circumstances not likely to be presented by another trial.

The judgment appealed from is set aside, and the case is remanded, to be proceeded with according to law.

O'NIELL, J., concurs in the decree, but not in the opinion that evidence of premeditation on the part of the accused was not admissible, nor in the ruling that evidence of the violent and dangerous character of the deceased was not admissible because, in the opinion of the court, the testimony of the accused that the deceased provoked the fatal difficulty, if believed by the jury, was a sufficient defense, without corroboration.