WAINWRIGHT *v.* CITY OF NEW ORLEANS.

No. 13.   Argued October 9–10, 1967.—Decided June 17, 1968.

*Melvin L. Wulf* argued the cause for petitioner. With him on the brief were *Norman Dorsen* and *Marvin M. Karpatkin.*

*Richard C. Seither* argued the cause for respondent. With him on the brief was *Alvin J. Liska.*

PER CURIAM.

The writ of certiorari is dismissed as improvidently granted.

MR. JUSTICE HARLAN, concurring.

I wish to state in a few words my reasons for joining in the dismissal of this writ as improvidently granted. For reasons stated in the dissenting opinion of my Brother DOUGLAS I agree that the dispositive federal issue in this case is whether the petitioner used an unreasonable amount of force in resisting what on this record must be regarded as an illegal attempt by the police to search his person.   I find this record too opaque to permit any satisfactory adjudication of that question.   See *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–575.

MR. JUSTICE FORTAS, with whom MR. JUSTICE MARSHALL joins, concurring.

With profound deference to the opinions of my Brethren who have filed opinions in this case, I am impelled to add this note.   Upon oral argument and further study after the writ was granted, it became apparent that the facts necessary for evaluation of the dispositive

constitutional issues in this case are not adequately presented by the record before us. It is also entirely clear that they cannot now be developed on remand with any verisimilitude.

The central issue that this case appeared to present for decision when certiorari was granted is of great importance. It is whether the police, seeing a pedestrian who fits the description of a person suspected of murder, may accost the pedestrian and stop him; and when and to what extent is the accosted person justified in refusing to cooperate with efforts of the police to establish that he is or is not the person whom they seek.

I am not prepared to say that, regardless of the presence or absence of adequate cause for police action, the arrest or the attempt by the officers to search is unlawful, as my Brother HARLAN's opinion suggests, where the accosted person produces no identification, attempts three times to walk away, and refuses to dispel any doubt by showing that his forearm is not tattooed. I should want to know whether, in fact, there was constitutionally adequate cause for the police to suspect that the pedestrian was the man sought for murder.

If the Court should, on an adequate record, determine that the police action in stopping and arresting petitioner violated his constitutional rights, there would remain, among other issues the question of culpability for the scuffle that ensued. My Brethren who have written in this case seem agreed that the record is too sketchy to permit decision of this issue.

The Court has properly dismissed the writ as improvidently granted. I respectfully submit that the Court is correct to leave the matter there. I should regret any inference that might be derived from the opinions of my Brethren that this Court would or should hold that the police may not arrest and seek by reasonable means to identify a pedestrian whom, for adequate cause, they

believe to be a suspect in a murder case. I do not believe that this Court would or should, without careful analysis, endorse the right of a pedestrian, accosted by the police because he fits the description of a person wanted for murder, to resist the officers so vigorously that they are "bounced from wall to wall physically" or to react "like a football player going through a line." Our jurisprudence teaches that we should decide issues on the basis of facts of record. This is especially important in the difficult, dangerous, and subtle field where the essential office of the policeman impinges upon the basic freedom of the citizen.

Mr. Chief Justice Warren, dissenting.

About midnight on October 12, 1964, petitioner, a student at Tulane University Law School, left his French Quarter apartment in New Orleans to get something to eat. Approximately four blocks from his apartment, two officers of the New Orleans Police Department who had observed petitioner as they cruised by in their car stopped him because in their opinion he fitted the description of a man suspected of murder. That suspect had tattooed on his left forearm the words "born to raise hell." Petitioner told the officers he had identification at home but not on his person. He gave them his name and address, and informed them he was a law student and was on his way to get something to eat. The officers told petitioner they thought he resembled a murder suspect, and asked him to remove his jacket so they could check his forearm for the tattoo. Petitioner refused, saying he would not allow himself "to be molested by a bunch of cops here on the street," and he "didn't want to be humiliated by the police." Petitioner was then suffering from a skin ailment which he apparently regarded as unsightly and which would have been exposed had he removed his

jacket, though he did not communicate this to the police. The police arrested him on a charge of vagrancy by loitering and frisked him.

During this incident petitioner attempted three times peacefully to walk away from the officers. The first two attempts came after petitioner had given what he regarded as sufficient identification. The third, although the officers were not certain about this, apparently occurred after petitioner was informed he was under arrest. Evidently on the basis of this last attempt, petitioner was subsequently charged with resisting an officer. Petitioner used no force in any of his attempts to walk away and each time stopped when so directed by the police.

After petitioner was inside the police car he called the officers "stupid cops," whereupon they told him he would also be charged with reviling the police. When the car arrived at the police station, petitioner offered to produce identification if they would take him home, but this offer was rejected. In the stationhouse, petitioner was interrogated for about 10 minutes concerning a "possible murder suspect." Thereafter, he was booked for vagrancy by loitering, resisting an officer, and reviling the police.

An officer then told petitioner to remove his jacket. Petitioner refused, folding his arms and crouching in a corner. Two officers, according to one of them, then "got hold of each of his arms . . . [and] tried to pry his arms apart, and . . . were bounced from wall to wall and bench to bench and back again." Petitioner did not strike at or kick the officers, but rather, according to one officer, "danc[ed] from wall to wall . . . trying to keep us from getting his arms." According to another, the officers were jostled only by "the combined effort of Mr. Wainwright in his refusal to remove the jacket. Force was necessary to remove the jacket by the officers." The

officers sustained no bruises, marks, or torn clothing as a result of this incident, and succeeded in removing petitioner's jacket and discovering he had no tattoo.

Petitioner's trial for the three charges based on the episode in the street—vagrancy by loitering, resisting an officer and reviling the police—commenced on December 4, 1964. After partial testimony the trial was adjourned, and not resumed until May 7, 1965, when the court heard further partial testimony and adjourned over petitioner's objection. The trial was again resumed on May 14, and at the close of the State's case on that day petitioner's motion for dismissal was taken under advisement, and three new charges based on events inside the police station were lodged against him. Respondent, before this Court, characterizes the original charges which were prosecuted against petitioner intermittently over a six-month period as "long-abandoned." Why the police waited six months before bringing charges based on events occurring within the police station is nowhere explained.

These new charges consisted of two counts of disturbing the peace by assaulting police officers, and one count of resisting an officer. Petitioner was convicted in the Municipal Court on all three counts. On appeal to the Criminal District Court, petitioner argued that his arrest and subsequent search were unlawful, and therefore he had a right to resist the search. He claimed that "[t]he legality of the arrest must be shown in order to find the defendant guilty of any crime in resisting it." He also argued that the evidence showed only that he tried to hold his jacket on, and that resistance of this type does not constitute the crime of assault. The court reversed the conviction for resisting an officer on the ground that the resistance must occur while the officer is making an arrest to constitute a crime under the ordinance. However, the court found the arrest was lawful, and since

"[t]he defendant was in police custody pursuant to a legal arrest . . . the officers had the right and the obligation to search the defendant . . . ." It held that "an individual in lawful police custody" cannot resist the actions of the police in doing their duty, and therefore affirmed the convictions for assault.[1]

Petitioner sought writs of certiorari, prohibition, and mandamus in the Louisiana Supreme Court, again arguing that because the arrest and search were unlawful he had a right to resist, and also that the "evidence merely shows that the defendant acted in self-defense and resisted the removal of his clothing." The court denied his application, holding: "The ruling of the Criminal District Court for the Parish of Orleans is correct."

Petitioner argues before this Court that his arrest and subsequent search in the stationhouse were unlawful and that he had a right under the Fourth Amendment reasonably to resist the unlawful search. In my view, there can be no doubt on this record that the arrest and subsequent search of petitioner were illegal. I believe that the illegality of the search alone requires reversal of the judgment below, which rejected possibly meritorious state-law claims on the erroneous premise that the search was lawful. Therefore, in accordance with this Court's well-established practice "not to formulate a rule of constitutional law broader than is required by the precise facts presented in the record," *Garner* v. *Louisiana,* 368 U. S. 157, 163 (1961), I would reverse and remand this case without reaching the question whether petitioner had, and acted within, a Fourth Amendment right to resist.

---

[1] The ordinance under which petitioner was convicted provides: "No person shall disturb the public peace by assaulting or beating another or by threatening to do bodily harm to another." § 42–24 Code of the City of New Orleans, Louisiana.

The officers had neither a warrant nor probable cause to arrest petitioner for vagrancy by loitering.[2] The loitering charge was based on the inconsequential circumstance that petitioner had been standing still for 5 to 10 seconds before the police approached him. That petitioner had no identification papers on his person and had very little funds obviously add nothing which could constitutionally make his conduct criminal. Cf. *Thompson* v. *City of Louisville*, 362 U. S. 199 (1960).

My Brother FORTAS suggests that we cannot determine whether petitioner's arrest was unlawful because the record does not reveal whether the officers had probable

---

[2] The reviling-the-police charge arose from an incident subsequent to the unlawful arrest. While it is not entirely clear from the testimony whether the charge of resisting an officer was based on petitioner's pre- or post-arrest attempt to walk away, the decision of the Criminal District Court reversing petitioner's conviction for resisting an officer based on events inside the police station makes clear that to constitute a crime under the relevant New Orleans ordinance the resistance must occur in the process of an arrest. Therefore, petitioner's pre-arrest attempts to walk away are irrelevant. His post-arrest attempt, just as his post-arrest alleged reviling of the police, cannot justify the initial arrest for vagrancy. Cf. *United States* v. *Di Re*, 332 U. S. 581, 595 (1948); *Byars* v. *United States*, 273 U. S. 28, 29 (1927). In any event, it is evident that these two charges are as baseless as the vagrancy charge. A peaceful attempt to walk away from a police officer, where the accused has identified himself, has committed no crime in the presence of the officer, and stops as soon as the officer directs him to cannot be regarded as the crime of resisting an officer, and, it is fairly clear, would not be so regarded in Louisiana. See *State* v. *Dunnington*, 157 La. 369, 102 So. 478 (1924); *State* v. *Scott*, 123 La. 1085, 49 So. 715 (1909). And with due regard for the sensitivity of police officers, it is simply inconceivable that it can be made criminal to speak the words "stupid cop," without more, in the privacy of a police car. It seems likely that the abandonment of the prosecution on these charges after the State had presented its case indicates that the prosecuting officials were well aware of the groundlessness of all three charges.

cause to arrest him for murder. I agree that the record does not permit a determination of whether the officers could lawfully have arrested petitioner for murder. With due respect, however, I suggest that this is an irrelevant inadequacy in the record. The record does establish that petitioner was not arrested for murder. The record does establish that the police interrogated petitioner for about 10 minutes concerning the murder before it was decided that he would not be booked for murder. The record does establish that petitioner was booked only for vagrancy by loitering, resisting an officer, and reviling the police.

"Booking" is an administrative record of an arrest. When a defendant is booked, an entry is made on the police "arrest book" indicating, generally, the name of the person arrested, the date and time of the arrest or booking, the offense for which he was arrested, and other information.[3] In Louisiana, as in most jurisdictions,[4] the police are required by law to book a suspect in this manner. La. Code Crim. Proc., Art. 228.[5] And as

---

[3] See W. LaFave, Arrest: The Decision to Take a Suspect into Custody 379–382 (1965). Cf. The President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 8 (1967).

[4] See, e. g., New York City Charter and Administrative Code § 435–12.0 (1963); District of Columbia Code § 4–134 (1967).

[5] La. Code Crim. Proc., Art. 228, provides that: "It is the duty of every peace officer making an arrest, or having an arrested person in his custody, promptly to conduct the person arrested to the nearest jail or police station and *cause him to be booked.* A person is booked by an entry, in a book kept for that purpose, showing his name and address, *the offense charged against him,* by whom he was arrested, a list of any property taken from him, and the date and time of booking. Every jail and police station shall keep a book for the listing of the above information as to each prisoner received. The book shall always be open for public inspection. The person booked shall be imprisoned unless he is released on bail." (Emphasis added.)

the Official Comment upon the pertinent Louisiana statute recognizes, this official and permanent arrest record "provides a valuable protection against secret arrests and improper police tactics." 1 La. Code Crim. Proc., p. 131. I see no more justification for permitting the State to disregard its own booking record than for permitting any other administrative body to disregard its own records. Quite the contrary. In the "low-visibility" sphere of police investigatory practices, there are obvious and compelling reasons why official records should prevail over the second-guessing of lawyers and judges. Nor would holding the police to official records frustrate any legitimate interest of society. If the police in this case really believed that petitioner was the murder suspect, and if they had probable cause to so believe, all they had to do was to arrest and book him for murder.[6] If they did not have such probable cause at the time they confronted petitioner on the street, they might have used techniques short of arresting him on a trumped-up charge to verify their suspicions.[7]

It is perfectly plain, however, that the police in this case were, to say the least, not confident that petitioner

---

[6] Of course, I do not mean to suggest that a defendant arrested and booked for one crime cannot later be charged with other crimes. The point is simply that when a controversy arises over the legality of the arrest, the police should be held to the booked offense.

[7] For example, one officer might have followed petitioner while the other secured more detailed information about the murder suspect from headquarters, and/or checked petitioner's identification by looking at a phonebook or going to the address he gave them. They might also have checked with someone connected with petitioner's law school. Another alternative would have been to suggest that petitioner voluntarily return to his apartment, which the officers knew was only four blocks away from the scene of the arrest, to secure identification—an offer which petitioner made upon arrival at the police station and the officers rejected.

was the murder suspect, and that the vagrancy charge here was used as a pretext for holding petitioner for further questioning concerning the murder. This technique, using a minor and imaginary charge to hold an individual, in my judgment deserves unqualified condemnation.[8] It is a technique which makes personal liberty and dignity contingent upon the whims of a police officer, and can serve only to engender fear, resentment, and disrespect of the police in the populace which they serve.

Since the arrest was unlawful, the subsequent search of petitioner in the stationhouse was also unlawful. See *Henry* v. *United States,* 361 U. S. 98 (1959); *Trupiano* v. *United States,* 334 U. S. 699 (1948); *Johnson* v. *United States,* 333 U. S. 10 (1948); *United States* v. *Di Re,* 332 U. S. 581 (1948). Because the opinion of the court below was predicated upon the asumption that this search was lawful, I think that the judgment below must be reversed. If the Louisiana courts had reached the correct conclusion that the police officers had no authority to search petitioner, they might well have concluded that petitioner was within his rights under local law in resisting this unlawful search.

There are two relevant and related legal principles which the Louisiana courts might have drawn upon in considering this question. The first is the principle of self-defense, which was inferentially raised by petitioner in his appeal to the Criminal District Court and ex-

---

[8] Cf. *United States* v. *Carignan,* 342 U. S. 36, 46 (1951); *Culombe* v. *Connecticut,* 367 U. S. 568, 631–632 (1961). Respondent, the City of New Orleans, urges that in 1958 it abandoned the practice of arresting for vagrancy pending investigation of other offenses. If this is so, the city is deserving of commendation. Irrespective of the general policy of the city, however, the instant case clearly demonstrates that the practice continues.

pressly noted in his application to the Louisiana Supreme Court. The idea that an individual cannot be held criminally responsible for acts done in reasonable defense of his person is deeply rooted in our jurisprudence. Self-defense has long been recognized in Louisiana,[9] and is now provided for by several sections of the State Criminal Code, one of which states:

> "The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person . . . ; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense . . . ."[10]

The Supreme Court of Louisiana has recently intimated that this defense is available to a defendant charged with aggravated assault upon a police officer, if the asserted assault was committed after the officer attempted unlawfully to arrest the defendant.[11] Whether such a defense is available against the disturbing-the-peace-by-assault charge upon which petitioner was convicted and

---

[9] State v. Chandler, 5 La. Ann. 489 (1850); State v. Scossoni, 48 La. Ann. 1464, 21 So. 32 (1896); State v. Baptiste, 105 La. 661, 30 So. 147 (1901); State v. Bolden, 107 La. 116, 31 So. 393 (1902); State v. Short, 120 La. 187, 45 So. 98 (1907); State v. Robinson, 143 La. 543, 78 So. 933 (1918); State v. Van Duff, 146 La. 713, 84 So. 29 (1920). See generally Comment, Self-Defense in Louisiana—The Criminal Law and the Tort Law Compared, 16 Tulane L. Rev. 609 (1942).

[10] La. Rev. Stat. § 14:19. This statute has been broadly interpreted by the Louisiana Supreme Court. State v. Rowland, 246 La. 729, 167 So. 2d 346 (1964). See also La. Rev. Stat. §§ 14:18, 14:20, 14:21, 14:22.

[11] State v. Tedeton, 243 La. 1031, 150 So. 2d 4 (1963). However, the assault in the Tedeton case was found to have been committed before any attempted arrest.

whether the record in the instant case establishes such a defense are questions of Louisiana law.

The second principle which the state courts might regard as dispositive in this case was announced by the Louisiana Supreme Court in *City of Monroe* v. *Ducas*, 203 La. 971, 14 So. 2d 781 (1943):

> "The right of personal liberty is one of the fundamental rights guaranteed to every citizen, and any unlawful interference with it may be resisted. Every person has a right to resist an unlawful arrest; and, in preventing such illegal restraint of his liberty, he may use such force as may be necessary." [12]

Petitioner vigorously argued in the state courts that he had a right to resist the stationhouse search which he contended was unlawful, but the state courts never came to grips with this issue because they held he was then in "lawful police custody" pursuant to "a legal arrest." By virtue of the *City of Monroe* case, *supra*, it appears with unmistakable clarity that an individual in Louisiana has a right under state law reasonably to resist an unlawful arrest. Whether this state right encompasses the right to resist an unlawful search and whether the amount of resistance here was reasonable are questions of state law.

Since the state courts' appraisal of these crucial questions of state law was foreordained by their erroneous ruling that the search of petitioner was lawful, they should be permitted the opportunity to reconsider these questions. Accordingly, I would reverse the judgment below and remand this case to the Louisiana Supreme Court for further proceedings consistent with this opinion. Because I believe the question whether the police can

---

[12] *City of Monroe* v. *Ducas*, 203 La. 971, 979, 14 So. 2d 781, 784 (1943). See also *Lyons* v. *Carroll*, 107 La. 471, 31 So. 760 (1902).

arrest someone on a trumped-up minor charge pending investigation of other crimes warrants this Court's condemnation, and because, unlike my Brethren, I do not find this record too opaque for what I consider a proper disposition, I respectfully dissent from the dismissal of the writ of certiorari as improvidently granted.

Mr. Justice Douglas, dissenting.

If this case is to be decided by the traditional Fourth Amendment standards applicable prior to *Terry* v. *Ohio, ante,* p. 1, the question is whether a person who is unconstitutionally arrested must submit to a search of his person, or whether he may offer at least token resistance.

Police officers while cruising late one night saw petitioner standing on a street corner and concluded that he fitted the general description of a murder suspect. They accosted him and asked him to identify himself. He had no identification on his person, only at home. He gave the officers his name and address, and informed them that he was a law student. The officers told him he was being questioned because he fitted the description of a murder suspect who had on his left forearm a tattoo which read, "born to raise hell." The officers asked him to remove the coat he was wearing so they could check his forearm, but he refused. He was then "seized" and taken to the police station, where he was asked to remove his jacket. He refused, folding his arms and crouching in a corner. The officers then attempted to take his jacket off, each pulling on one arm. There was no battle or fracas of any consequence. Petitioner, however, did resist this attempt by moving about and by pushing one officer to one side and then pushing the other officer to the other side. But so far as the record shows no more violence happened than that produced by the combined efforts of petitioner and the officers which caused the officers to be butted around the room. He

did not strike at the officers, or kick them, and none of them had any marks or bruises or torn clothing.[1]

He was booked on three charges—vagrancy, resisting an officer, and reviling the police.

At the end of the State's case petitioner moved for dismissal of the charges. That ruling was held under advisement and petitioner was at once arraigned on three new charges, one of resisting an officer and two for disturbing the peace by assaulting an officer. The trial on

---

[1] I do not, as my Brothers HARLAN and FORTAS suggest, consider the record too sketchy for determining the degree of force employed by petitioner in resisting the officers. The record discloses that no violence and little force were used by petitioner.

Lieutenant Martello, the officer apparently in charge of the station to which petitioner was taken, testified as follows:

"Mr. Wainwright refused to take his jacket off . . . so I instructed him I would have the jacket removed by the doorman.

"He again refused. He walked into a corner, grabbed his jacket by his hands, folding his arms, and he said, 'If you want this jacket off take it off.'

. . . . .

"Officer O'Rourke and Officer Gilford asked him to take the jacket off and he didn't respond, so they physically took the jacket off of him. He done everything in his power to keep them from removing the jacket. In this operation the officers were bounced from wall to wall physically, and with the assistance of a couple of other police officers they put handcuffs on one of his arms, and they removed his jacket."

On cross-examination, Martello elaborated:

"Q. You testified that Mr. Wainwright crouched in a corner, held his jacket to him, now what did he do when Officers O'Rourke and Gilford tried to remove it?

"A. He tried to keep it on by holding it.

"Q. How?

"A. By folding his arms (demonstrates).

"Q. He didn't do anything else?

"A. No, not to my knowledge.

"Q. If Officer O'Rourke and Officer Gilford got thrown around the room, it was through their own effort?

"A. No, it was the combined effort of Mr. Wainwright in his

this second case was had and petitioner fined $25 on each charge or given 30 days in jail on each charge, the sentences being suspended. On appeal the conviction of resisting an officer was reversed, but his conviction on two charges of disturbing the peace was affirmed by the Criminal District Court and later by the Supreme Court of Louisiana, the complaint in the first case apparently being abandoned. While petitioner tried to get the appellate courts to incorporate the record in the first case into the record in the second, that was not done. But that defect has been remedied here, the transcripts of all the hearings now being before the Court.

The records before us do not even approach establishing probable cause for arrest. The officers had no warrant. They did not see petitioner commit any crime. There was no arrest which could be justified under the heading of vagrancy. That could be made use of only

---

refusal to remove the jacket. Force was necessary to remove the jacket by the officers.

"Q. He didn't do anything but try to hold the jacket on?

"A. They tried to take it off, and he was trying to keep the jacket on.

"Q. He held very still?

"A. No, it was a struggle.

"Q. Did he strike out at the officers?

"A. No.

"Q. Did he kick the officers?

"A. I didn't see him. He could have. I didn't see him. It wasn't visible to me."

Later, in answer to a question posed by the court, Martello stated that none of the four officers who removed petitioner's jacket suffered any "marks, bruises, or torn clothing."

On cross-examination Officer O'Rourke testified as follows:

"Q. How was he [petitioner] pushing you around? Did he strike out at someone?

"A. No. Like a football player going through a line.

"Q. Did he try to run?

"A. No, dancing from wall to wall."

by the factor of loitering, but petitioner was seen standing still for only five to 10 seconds. To be sure he did not have identification papers on him and "very little funds." But those factors obviously could not be ingredients of a crime under our present system of government. Cf. *Thompson* v. *Louisville,* 362 U. S. 199.

It is plain that the officers "seized" petitioner to question him further concerning a murder. It is apparently on that ground that the Criminal District Court concluded that petitioner's arrest was "legal." But he was not arrested for murder or for any related offense, but only for vagrancy. The circumstances of this case show that the arrest was no more than arrest on suspicion,[2] which of course was unconstitutional—at least prior to *Terry* v. *Ohio*—and robs the search of any color of legality. *Henry* v. *United States,* 361 U. S. 98.

Under our authorities (cf. *Elk* v. *United States,* 177 U. S. 529, 534–535; and see *United States* v. *Di Re,* 332 U. S. 581, 594), at least prior to the ill-starred case of *Terry* v. *Ohio,* a citizen had the right to offer some resistance to an unconstitutional "seizure" or "search." Must he now stand quietly and supinely while officers "pat him down," whirl him around, and throw him in the wagon?

The present episode may be an insignificant one and the hurt to petitioner nominal. But the principle that a citizen can defy an unconstitutional act is deep in our system. *Thomas* v. *Collins,* 323 U. S. 516, 532–537.

---

[2] What transpired after the arrest for vagrancy demonstrates that the officers merely suspected petitioner was involved in the murder because of a superficial resemblance to the wanted man. Officers testified that the reason they wished to remove petitioner's jacket after he was in custody was to see if his arm was tattooed—that is, to ascertain if petitioner's resemblance to the murder suspect was more than superficial.

When in a recent case (*Wright* v. *Georgia,* 373 U. S. 284, 291–292), it was said that "failure to obey the command of a police officer constitutes a traditional form of breach of the peace," we made a qualification: "Obviously, however, one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."

We should not let those fences of the law be broken down.

This case points up vividly the dangers which emanate from the Court's decision in *Terry* v. *Ohio,* the so-called "stop-and-frisk" case. If this case is to be decided by the new test of "searches" and "seizures" announced in that case, startling problems are presented. The officers here had no more than an unsubstantiated suspicion that petitioner was a murder suspect, a suspicion based only on a superficial resemblance between petitioner and the wanted man. Thus they had no right to "seize" petitioner. Is the case dismissed as improvidently granted because the officers had "reasonable suspicion" justifying the seizure, or reasonable grounds to believe that petitioner was armed and dangerous? These questions are not answered by the Court; and leaving them unanswered gives a new impetus to *Terry* v. *Ohio.* If this "seizure" was constitutional, then the sleepless professor who walks in the night to find the relaxation for sleep is easy prey to the police, as are thousands of other innocent Americans raised in the sturdy environment where no policeman can lay a hand on the citizen without "probable cause" that a crime has been or is about to be committed. That was the philosophy of Walt Whitman, Vachel Lindsay, and Carl Sandburg and it was faithfully reflected in our law.

The interest of society in apprehending murderers is obviously strong; yet when the manhunt is on, passions often carry the day. I fear the long and short of it is that

an officer's "seizure" of a person on the street, even though not made upon "probable cause," means that if the suspect resists the "seizure," he may then be taken to the police station for further inquisition. That is a terrifying spectacle—a person is plucked off the street and whisked to the police station for questioning and identification merely because he resembles the suspected perpetrator of a crime. I fear that with *Terry* and with *Wainwright* we have forsaken the Western tradition and taken a long step toward the oppressive police practices not only of Communist regimes but of modern Iran, "democratic" Formosa, and Franco Spain, with which we are now even more closely allied.