298 So.2d 495 (1973)
Robert Benjamin CANNEY, Appellant,
v.
STATE of Florida, Appellee.
No. 70-724.
District Court of Appeal of Florida, Second District.
September 7, 1973.
Rehearing Denied August 16, 1974.
*496 Benjamin E. Smith, of Smith & Scheuermann, New Orleans, La.; Maynard F. Swanson, Jr., Clearwater, and Gardner W. Beckett, Jr., St. Petersburg, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Charles Corces, Jr., Asst. Atty. Gen., Tampa, for appellee.
HOBSON, Judge.
Appellant seeks review of a judgment and sentence entered against him following a jury verdict of guilty as charged rendered September 22, 1970, in response to a Bill of Information charging appellant with "Resisting an Officer with Violence."
On April 18, 1970 an anti-Vietnam war rally was held at Straub Park in St. Petersburg, Florida. A podium was set up with a public address system and several speeches, in addition to appellant's, were made during the course of the rally. During his speech before the gathering, appellant was quoted to have said "... bring the Goddamned war home" and to have used the phrase "the Goddamn pigs."
Appellant finsished his speech and sat down on the grass. Thereupon Officer Spivey approached him, tapped appellant on his right shoulder and said, "You are under arrest for disorderly conduct, profane language." Appellant then jumped up and yelled, "Don't let them do this to me," and "You are not going to arrest me." The crowd then began throwing bottles and sticks at the officers.
During the ensuing scuffle between Officer Spivey and appellant, appellant verbally abused the officers by directing obscenities towards them and successfully punched Officer Spivey on the right side of his face, thereby cutting the inside of his mouth. Appellant was finally placed in the paddy wagon and taken to the police station.
Appellant contends that the state is required to prove a lawful arrest as a necessary element in its prosecution for violation of F.S. § 843.01, F.S.A., Resisting Officer with Violence to his Person. Therefore, appellant submits that St. Petersburg, Fla., Code Ch. 25, § 42, as amended, Ordinance No. 213-E (1970) entitled Obscene Language[1] is unconstitutional and any arrest thereunder was unlawful, thereby vitiating appellant's subsequent conviction for Resisting Arrest which he now appeals. We disagree.
Irrespective of the constitutionality of the city ordinance which appellant now collaterally attacks, the lawfulness of the arrest "... must stand or fall upon the facts and circumstances then existing." Carter v. State, Fla.App. 1967, 199 So.2d 324, at p. 328. The legality of an arrest does not depend upon the conviction or acquittal of the accused. See Rinehart v. State, Fla.App. 1959, 114 So.2d 487, cert. dismissed Fla., 121 So.2d 654, cert. den. 365 U.S. 849, 81 S.Ct. 812, 5 L.Ed.2d 813 (1961).
"In considering the legality of an arrest by a municipal officer for a breach of the peace committed in his presence, the determining factor is not whether the charged person is actually guilty. The question to be determined is whether or not the officer had substantial reason to believe the plaintiff was committing a misdemeanor. If substantial reason exists the courts cannot second guess the officer in the performance of his duty." City of Miami v. Albro, Fla. App. 1960, 120 So.2d 23, at p. 26.
*497 Certainly after hearing appellant's speech and with the knowledge that a city ordinance, which had not been declared invalid existed which intended to protect the public at large from having to hear such offensive language, Officer Spivey had sufficient reason to arrest appellant in full compliance with § 901.15, F.S.A.[2]-[3]-[4]
The judgment appealed is therefore affirmed.
Affirmed.
PIERCE, J. (Ret.), concurs.
MANN, C.J., dissents with opinion.
MANN, Chief Judge (dissenting).
If in Stalin's time, in the St. Petersburg which had by then become Leningrad (saints having fallen from grace in the Soviet Union), a citizen had been arrested for cursing the "goddam war" and calling the visibly present police "goddam pigs," I could understand it. But Canney was arrested at a peace rally in St. Petersburg, Florida, and I cannot understand it.
The legality of Canney's arrest for profanity is essential to affirmance of this conviction. The trial judge might have been misled in this regard, but we are not. In the time-honored tradition of the trial bar, the law was researched after the appeal was filed.
In fact, the prosecutor responded to defense counsel's suggestion that Canney could not be guilty of resisting arrest with violence unless the arrest resisted were lawful by saying, "If you want to rule as a matter of law that Goddamn Pig isn't profane and `Let's bring the goddamn war home' isn't profane, let's direct a verdict of not guilty right now." Later, defense counsel argued that this is a First Amendment case to which the prosecutor replied, "That is exactly what we are not dealing with, Judge. We are not dealing with a First Amendment case. We are dealing with resisting arrest with violence. If you want to deal with the First Amendment, you go to the Federal Court. We are not concerned with that here."
Our oath embraces two Constitutions. We must consider constitutional claims in state courts, and it is a reproach to the state judiciary that they are commonly brought in federal courts where concurrent jurisdiction exists. It is also a bother to the Federal judiciary. Too, it is utterly impossible to try the prosecution's case in the state court and the defense's case in federal court, unless, as must inevitably follow in this case, state courts fail to act *498 on the appellant's obviously valid First Amendment claim.
The statute[1] requires that the state prove that Canney resisted a lawful arrest, and that necessarily involves the question whether, in a political context, where there is no disturbance whatever except that created by these two overzealous policemen, and where Canney had finished his vulgar and repulsive speech and sat quietly down before he was arrested, an American citizen can be arrested for invoking divine vengeance upon a war he doesn't like and a constabulary he regards as repressive.
Our Florida Supreme Court has expressly ruled that the validity of the arrest must be shown, in cases the trial judge didn't know about, but we do.[2] In Licata v. State, the defendant was charged with wilfully resisting and obstructing a deputy sheriff in the execution of legal process. The charge was insufficiently proved because there was no showing that the officer was executing any legal process. In dictum, the Supreme Court went on to say that if the defendant had been charged with resisting or obstructing the officer in the performance of a legal duty, "it would have been necessary for the State to prove that Myers was attempting to make an arrest which he had lawful authority to make ..." 156 Fla. at 694, 24 So.2d at 98. Jackson v. State is an even stronger case. Ida Bell Jackson was convicted of obstructing a deputy sheriff in the exercise of legal process, and won reversal on appeal because the warrant under which the deputy acted did not particularly describe the place to be searched.
We are not involved here with the question whether the Legislature can make it criminal to resist with violence or otherwise an unlawful arrest. It would seem to me more civilized if those arrested went along quietly and left to prompt determination by the courts the legality of their detention, but the Legislature has specifically protected those arrested unlawfully on misdemeanor charges against the ballooning of the charge to felonious status upon the arrestee's display of indignation amounting to physical resistance. We are obligated to construe the statute as written, in the light of our Supreme Court's interpretation, regardless what we think it should say.
More recently, our sister court in the Fourth District has reversed a conviction for aggravated assault stemming from an arrest for violation of an ordinance later held unconstitutional. Russo v. State, Fla. App. 4th 1972, 270 So.2d 428. The same court has recognized in two cases that the statute means precisely what it says and what our Supreme Court says it says, namely, that the State must prove that the arrest was lawful. Kirby v. State, Fla. App. 4th 1969, 217 So.2d 619; Rosenburg v. State, Fla.App. 4th 1972, 264 So.2d 68. The question in each of those cases was whether the misdemeanor for which the original arrest was made was committed in the officer's presence, and it was held that the arrests were lawful. Following Licata, the Fourth District recognized the lawfulness of arrest as a necessary element of the State's case. I have no quarrel with State v. Briggs, the Missouri case cited in the majority opinion. Briggs was convicted of assaulting an officer, an offense of which Canney may well be guilty, but it is not the offense with which he was charged. Canney was charged with resisting a lawful arrest with violence, and proof of the unlawfulness of the arrest is required by the plain language of the statute and the plain mandate of the Supreme Court.[3]
*499 The trial court did not fully consider Canney's claim based on discriminatory enforcement.[4] "Goddam" is a word taken into the vocabulary, and infests our literature.[5] It is a bi-partisan epithet: President Roosevelt applied it to a broken voting machine[6] and former Attorney General John Mitchell was quoted by the Associated Press on June 15, 1972, as using it. It transcends terrestrial boundaries: an astronaut on the moon used it, and I heard no clamor for his prosecution, though I recognize a delicate venue problem. The law seems to be that you can't use the phrase in St. Petersburg if it offends the police.
At the core of this case is the question  rarely considered  whether profanity is constitutionally punishable when uttered in a political context without threat to the public peace. I contend that it is not.
Profanity as a crime in America owes such support as it has to Chancellor Kent, whose decision in People v. Ruggles[7] borrows heavily from Blackstone. Blackstone may well have spoken of the state's solicitude for the church. The notion of a state religion is not foreign to the English. In 1838, Baron Alderson said:
"A person may, without being liable to prosecution for it, attack Judaism, or Mohammedanism, or even any sect of the Christian religion (save the established religion of the country); and the only reason why the latter is in a different situation from the others is because it is the form established by law, and is therefore a part of the constitution of the country. In like manner, and for the same reason, any general attack on Christianity is the subject of criminal prosecution, because Christianity is the established religion of the country."[8]
That language is repeated in some early American cases, like Ruggles and Commonwealth v. Kneeland[9], but it was common in the early years of the American Republic to view offenses against religion as offenses against society because of their tendency in those times to incite violent response. Perhaps that justification was then adequate. Today it is not, generally, and in the case before us there was no disturbance at all until Canney was arrested. A comprehensive note on the subject of "Blasphemy" at 70 Col.L.Rev. 694 (1970) traces the historical bases of offenses against religion in English and American law.
In Florida, our Supreme Court has not dealt directly with profanity, so far as I can determine, but mentioned it in Cason v. Baskin, 1944, 155 Fla. 198, 20 So.2d 243 at 247. There the court held that an action lay for invasion of privacy but that the complaint did not make out a cause of action for libel. That portion of the opinion *500 which discusses profanity is instructive:
"It is true, the author states that her friend Zelma had one characteristic, which a large proportion of the people in this section of the country consider a very serious fault, especially in a woman, and yet which a good many others may think a justifiable form of condemnation or reproof, according to the particular circumstances,  that is, the use of `profanity'. But the one sample which the author gives of her friend's `particular brand of profanity,' is really not profanity within the legal meaning of that word, even though the blank spaces in the quoted words be given the meaning which appellant contends they were intended to signify. This court has never defined the legal meaning of the word `profanity', so far as this writer has been able to discover, but a number of other courts of last resort have done so, and practically all of them, following pretty closely the dictionary meaning, define it as the use of words importing `an imprecation of Divine vengeance,' of `implying Divine condemnation,' or words denoting `irreverence of God and holy things'  blasphemous. These decisions doubtless hark back to the third Commandment of the Decalogue: `Thou shalt not take the name of the Lord thy God in vain.'"
Is Canney's saying "goddam" twice punishable as profanity? Far more offensive language is protected by the First Amendment. In Cohen v. California,[10] the defendant's sweatshirt bore the message, "f____ the draft." Though worn in a courthouse, the conduct was protected under the First Amendment. The appropriate distinction is made in two New Jersey cases. In State v. Brown,[11] the defendant was properly convicted for saying "I'll kick the s____ out of you, you m____ f____  remember you work for me  you take that badge off and I'll kill you." Those are fighting words, and Chaplinsky v. New Hampshire[12] governs. But State v. Rosenfeld[13], is a different matter. There a young white teacher, sympathizing with black citizens and crudely affecting what he thought to be their language, made an emotional appeal to correct some faults in the community and ended by saying that if whites didn't do something about the problem "then the Mother F____ town, the M.F. county, the M.F. state and the M.F. country would burn down."[14] There was no disturbance. A visiting police chief demanded, and got, Rosenfeld's arrest. His language was ultimately held constitutionally privileged, there being no provocation to violence.
It is on this point that Rosenfeld hinges, and it is to be noted that the New Jersey court was considering the case after vacation of the judgment and remand by the Supreme Court of the United States, ordering it to reconsider in the light of Cohen v. California[15] and Gooding v. Wilson[16]. Strong dissents were registered: Chief Justice Burger and Justices Blackmun, Powell and Rehnquist argue that the offensive conduct is constitutionally punishable. Mr. Justice Powell argues that "the exception to First Amendment protection recognized in Chaplinsky is not limited to words whose mere utterance entails a high probability of an outbreak of physical violence. It also extends to the willful use of scurrilous language calculated to offend the sensibilities of an unwilling audience."[17] *501 I confess that I find Mr. Justice Powell's argument highly persuasive, and were I among their number I might make the fifth vote for that viewpoint. But no one of the three of us can make a strong minority of the Supreme Court of the United States into a majority, though two have gone far beyond what any Justice has argued in Rosenfeld. Note that Canney spoke to a willing and appreciative audience, and that language the police found offensive has been attributed in recent weeks, in publications of national circulation, to the President of the United States, a former Attorney General and his articulate wife. One of those three is presently under indictment, but not for anything so petty as the offense for which Canney was arrested.
The only element in Cohen and Rosenfeld not involved there but present in this case is the offense to the Deity. Do the majority pretend that we are following the precedents, recognizing the cases I have cited but are nevertheless punishing the offense to the Deity? If so, are we not restricting the First Amendment in aid of religion? The question has not been considered by the Supreme Court, probably because such an absurd arrest as this has not been approved by the courts through which it came on the way.
Thus I conclude: 1) that there is no proof of a lawful arrest as the statute clearly requires; 2) that Canney's arrest for profanity constitutes a violation of his First Amendment right to speak freely, in a political contest, to a willing audience, where there is no threat to order; 3) that the enforcement of an ordinance against profanity, unrestrained by definition or construction to those circumstances provocative of disturbance or harm, constitutes a violation of the First Amendment prohibition against establishment of religion.
I do not think that Canney is any conservator of American liberty. He is a consumer of our liberties, one of those whose idea is to push his constitutional liberty to the point of provocation. He must be among those who provoked a majority of those polled recently who would willingly abolish rights secured for nearly two centuries by the Bill of Rights. Canney reminds one of Wainwright, the law student thought by New Orleans police to resemble a murderer who had a tattoo on his arm: "born to raise hell." Wainwright refused to allow police to see his arm, and the consequences of his resistance are chronicled in several opinions upon the dismissal of certiorari in the Supreme Court of the United States for want of an adequate record.[18] And the policemen in that case remind one of those in this one, overreacting, allowing their emotions to overcome their reason, and thus contributing to an overblown situation which sanity and civility on either side could have avoided. It certainly wouldn't have hurt Wainwright to have shown, as he could easily do, that he wasn't a murder suspect. And it would work no hardship on Canney to refrain from uncouth utterance in public. But what is involved is not what they should have done, but what the law requires.
In my view, constitutional liberty is equally threatened by these two policemen who, hearing the word "goddam" uttered by one whose views offended them, arrested him and by Canney, foul-mouthed and offensive, oblivious to what Lord Coleridge called the "decencies of controversy."[19] If policemen do not act with restraint, and if a free people do not behave responsibly, liberty is insecure. Centuries ago, English citizens so regarded their responsibility for upholding the law that a citizen who discovered a burglary recruited a dozen or more from nearby public houses and apprehended *502 the burglars.[20] And in 1710 the King's Bench said, in reducing a charge of murdering a constable to manslaughter on the ground that the defendant responded  albeit excessively  to the unlawful arrest of another citizen: "... if one be imprisoned upon an unlawful authority, it is a sufficient provocation to all people out of compassion, much more where it is done under a colour of justice, and where the liberty of the subject is invaded, it is a provocation to all the subjects of England."[21] If each American could consider himself a conservator of the peace and muster indignation at the misconduct of others regardless whether they express views with which we agree or represent viewpoints with which we identify, we have prospects of becoming a reasonably civilized society. Respect for law is essential to our survival. I am optimist enough to believe, with William Faulkner, that Man will not only endure: he will prevail.
Until then, we must tolerate a wide latitude for the expression of opinion. What makes American beautiful is not only its purple mountain majesties and the like, but the fact that a crude person like Canney is at liberty to speak his mind about the nation's conduct of a war in Vietnam, and is under no compulsion to agree with me or the St. Petersburg police force. I count it a grave reflection on this court that we will not enforce his clear constitutional rights. Belief in the perfectibility of man consoles me somewhat. I have no cave on whose walls to draw this prophecy, so I entrust it to the ephemeral pages of the Southern Reporter: someday before God in His own good time comes to judge the Vietnam war, vulgar orators, insensitive policemen and  humbling thought  even judges, some anthropologist seeking the missing link between the apes and civilized man is going to discover that we are it. "In those days they shall say no more, The fathers have eaten a sour grape, and the children's teeth are set on edge."[22]

ON PETITION FOR REHEARING
PER CURIAM.
Rehearing Denied.
HOBSON, J., and PIERCE, Wm. C., J., (RET.), concur.
MANN, C.J., would grant rehearing.
MANN, Chief Judge (dissenting from denial of rehearing).
Since we decided this case the Supreme Court of Florida has decided Jones v. State, Fla. 1974, 293 So.2d 33. That case upheld the constitutionality of Fla. Stat. § 847.05 (1973), which provides:
"Any person who shall publicly use or utter any indecent or obscene language shall be guilty of a misdemeanor of the second degree... ."
Jones was a case very much like this one and it does support the position of the majority, but in my view it is clearly and directly contrary to Gooding v. Wilson, 1972, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408; Lewis v. New Orleans, 1972, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321, and Rosenfeld v. New Jersey, 1972, 408 U.S. 901, 92 S.Ct. 2484, 33 L.Ed.2d 321, possibly through inadvertence. The central question which is involved in Jones was not touched upon by the majority opinion in that case. Our Supreme Court treated only the question of overbreadth and, finding that the statute "contains language sufficient to convey to a person of common understanding its prohibition" upheld its constitutionality. In short, the Court did not deal *503 with the question whether the First Amendment to the Constitution of the United States permits the Legislature of the State of Florida to enact such a statute in the first place, assuming that it informs the public precisely what conduct is prohibited. The statute held unconstitutional in Rosenfeld reads:
"Any person who utters loud and offensive or profane or indecent language in any public street or other public place, public conveyance or place to which the public is invited ... is a disorderly person."
That statute, like that in Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, was the subject of a prior limiting interpretation by the Supreme Court of the state. The statute stricken in Gooding v. Wilson, supra, was rather narrowly drawn in the first place and was limited to language tending toward a breach of the peace. Indeed, a good argument can be made for the position of the four dissenting justices in Gooding, but I can see no good argument for this court or the Supreme Court of Florida because all of us are bound by that decision.
Assuming the validity of the statute, there is still the question of its unconstitutional application to a purely political message which did not threaten violence until these policemen intervened.
To the argument that an ordinance is valid until declared invalid, I can only respond that there must be in the southern part of the United States hundreds of municipal ordinances forbidding black persons to ride in the front of the bus which have never been judicially construed. If my brother Hobson is saying that the occasional discovery and implementation of such an ordinance should result in an indignant response which culminates in the arrestee's pushing an officer, and that he thereby becomes a felon although a moment before impact he was immune from prosecution, I cannot accept that argument. There is indeed a strong argument which can be made for the proposition that there is a constitutional right to resist an unlawful arrest. See Note on Use of Force to Resist Unlawful Arrest, in Kadish & Paulsen, The Criminal Law and its Processes 506. I concede that an arrest made in good faith may be unconstitutional without being actionable, Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, but the notion that this arrest for speaking freely was not unlawful although it was unconstitutional makes a mockery of the supremacy clause. U.S.Const. Article VI. I regret that we have made a mess for the federal courts to clean up.
NOTES
[1] Obscene language.

"It shall be unlawful for any person to use profane, vulgar or indecent language in any public place; or upon the private premises of another, or so near thereto as to be heard by another."
[2] F.S. § 901.15 When Arrest by Officer Without Warrant is Lawful. 

A peace officer may without warrant arrest a person:
(1) When the person to be arrested has committed a felony or misdemeanor in his presence. In the case of such arrest for a misdemeanor, the arrest shall be made immediately or on fresh pursuit.
(2) When a felony has in fact been committed, and he has reasonable ground to believe that the person to be arrested has committed it.
(3) When he has reasonable ground to believe that a felony has been or is being committed and reasonable ground to believe that the person to be arrested has committed or is committing it.
(4) When a warrant has been issued charging any criminal offense and has been placed in the hands of any peace officer for execution. [Subsequently amended 1970]
[3] Id., note 2. Also, the elements of an arrest comprehend a purpose or intention to effect an arrest under a real or pretended authority, the actual or constructive seizure or detention of the person to be arrested by the one having the present power to control him, communication by the arresting officer to the one whose arrest is sought of his intention or purpose then and there to make an arrest, and an understanding by the person who is to be arrested that it is the intention of the arresting officer then and there to arrest and detain him. See: Melton v. State, Fla. 1954, 75 So.2d 291.
[4] A case directly in point and resulting in the same holding as the case sub judice is a Missouri case, State v. Briggs, 1968, 435 S.W.2d 361.
[1] Fla. Stat. § 901.15 (1971), F.S.A.
[2] Licata v. State, Fla. 1945, 156 Fla. 692, 24 So.2d 98. See also Jackson v. State, Fla. 1917, 87 Fla. 262, 99 So. 548.
[3] Because the Florida statute is so clear and has been interpreted so consistently as requiring proof of lawful arrest, I do not treat the question whether one has a constitutional right to resist an unlawful arrest. See Chevigny, The Right to Resist an Unlawful Arrest, 1969, 78 Yale L.J. 1128; Wainwright v. New Orleans, 1968, 392 U.S. 598, 88 S.Ct. 2243, 20 L.Ed.2d 1322.
[4] Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Cox v. Louisiana, 1965, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487; Notes, 59 Yale L.J. 354; 61 Col.L.Rev. 1103.
[5] H.L. Mencken, The American Language, 667-74 (1960): "Toward the middle of the Seventeenth Century the Puritans began calling the Cavaliers goddammes, but the term seems to have passed out at the Restoration. Many euphemisms for goddam have flourished in America, e.g., goshdarn, goldarn, goshdad and goshdang."; Pei, The Story of the English Language, 269 (1967): "The movie industry, which has to abide by a code, has devised a most ingenious series of opprobrious epithets which sound authentic, yet get by the censor. Among them are filth and son of a Yorkshire Steer. Hell and damn are officially banned from TV, along with, presumably, such compound forms as God damn or Goddam (interestingly, this expletive is turned into a noun by a medieval French writer, Olivier Basselin, and applied indiscriminately to all Englishmen, who are referred to as ces godons, panches a pois (`these pea-bellied Goddams')."; Johnson, The Lost Art of Profanity, 25-27, 46-47 (1948).
[6] Mencken, supra n. 5 at 669.
[7] 8 Johns. 290 (N.Y. 1811).
[8] Gathercole's case (1838) 2 Lewin, C.C. (Eng.) 237.
[9] 1838, 37 Mass. (20 Pick.) 206.
[10] 1971, 403 U.S. 15, 91 S.Ct. 780, 29 L.Ed.2d 284. See also Williams v. District of Columbia, 1969, 136 U.S.App.D.C. 56, 419 F.2d 638.
[11] 1973, 62 N.J. 588, 303 A.2d 886.
[12] 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031.
[13] 1973, 62 N.J. 594, 303 A.2d 889.
[14] 303 A.2d at 891.
[15] 1971, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284.
[16] 1972, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408.
[17] 408 U.S. 901 at 905, 92 S.Ct. at 2479, 2481, 33 L.Ed.2d 321 at 322.
[18] Wainwright v. New Orleans, 1968, 392 U.S. 598, 88 S.Ct. 2243, 20 L.Ed.2d 1322.
[19] Regina v. Ramsay, 15 Cox Crim.Cas. 231 (Q.B. 1883).
[20] Rex v. Vandercomb & Abbott, 2 Leach 707, 168 Eng.Rep. 455 (Crown 1796).
[21] Regina v. Tooley, 2 Ld.Raym. 1297, 92 Eng.Rep. 349, 352 (K.B. 1710).
[22] Jeremiah 31:29.