**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Hozie CHAMBERLIN,
Defendant–Appellant.**

**No. 79–1076.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1979.

Decided Oct. 7, 1980.

Judy C. Clarke, San Diego, Cal., for defendant–appellant.

Michael H. Walsh, U. S. Atty., David C. Doyle, Asst. U. S. Atty., San Diego, Cal., (argued), for plaintiff–appellee; David C. Doyle, Asst. U. S. Atty., San Diego, Cal., on brief.

Before CHOY, ANDERSON and HUG, Circuit Judges.

HUG, Circuit Judge:

The opinion of December 26, 1979 is hereby withdrawn and the following opinion is substituted. Hozie Chamberlin appeals from a conviction of possession of a check stolen from the mail in violation of 18 U.S.C. § 1708. The principal question on this appeal is whether the detention of the appellant following an investigatory stop resulted in a seizure amounting to an unlawful arrest, requiring suppression of the evidence derived from that detention. The appellant moved to suppress the evidence; and upon denial of the motion he waived a jury trial and proceeded to trial before the court on stipulated facts. We find that the detention was unlawful and the motion to suppress should have been granted. We therefore reverse.

The issues involved are: (1) whether the investigatory stop of Chamberlin by the officer was justified by founded suspicion; (2) whether the subsequent detention amounted to unlawful arrest without probable cause; and (3) whether subsequent evidence obtained was the fruit of an unlawful arrest.

*Facts*

On October 4, 1978 at about 12:20 P.M. Officer Morse of the San Diego Police Department, while driving on routine patrol, observed appellant, Hozie Chamberlin, and a companion, Robert Franklin, walking

away from the Chicano Park area in southeast San Diego. Officer Morse recognized Chamberlin and Franklin as individuals with extensive criminal records for narcotics violations, receipt of stolen property, forgery and burglary. Officer Morse was suspicious that criminal activity was afoot because they looked worried as he passed and quickened their pace. He drove back by the area about a minute later. Robert Franklin then darted between two houses, looked back out between the houses at the officer and began running away. Appellant Chamberlin also attempted to flee but was hampered from running because of his physical handicap.

Officer Morse caught up with Chamberlin and asked him what he was doing. Chamberlin replied that he was returning from paying his mother's furniture bill at the Universal Furniture Store. Officer Morse then asked why Robert had run away. Chamberlin replied, "I don't know any Robert." This increased Officer Morse's suspicions because he knew that Chamberlin and Robert Franklin were well acquainted.

At this point, Officer Morse required appellant Chamberlin to get in the back of the patrol car so he could continue his search for Robert Franklin. It was Officer Morse's intention to detain Chamberlin for further investigation while he attempted to find Franklin.

Officer Morse proceeded to Franklin's residence and began working back towards the area from which Franklin and Chamberlin had fled. Five minutes after Chamberlin's detention began, Officer Morse received a radio call informing him that a check had been found lying near the point where Chamberlin and Franklin had been when they had begun to flee. He then went back to the area and obtained the check, which was a United States Treasury check bearing the name "Willie Johnson" as payee.

When Officer Morse returned to his patrol car with the check, Chamberlin became nervous and began to sweat. Officer Morse then reinquired as to Chamberlin's statement regarding paying his mother's furniture bill at the Universal Furniture Store. Chamberlin denied that he made any statement about having been at the Universal Furniture Store and explained that his mother lived on University Avenue and that this was possibly what the officer heard him say. At this point, Officer Morse decided to go to the Universal Furniture Store to investigate the matter further.

He drove to the store with Chamberlin still in the back of the patrol car. At the store the manager and the employees informed Officer Morse that they knew Hozie Chamberlin and that he had been in the store an hour earlier attempting to negotiate a check. Officer Morse showed them the check bearing the name "Willie Johnson" as payee and they identified it as the check Chamberlin had earlier tried to cash. Officer Morse then placed Chamberlin under arrest. Chamberlin had been detained in the rear of the patrol car for twenty minutes from the time he was first picked up.

Chamberlin was indicted for possession of a check stolen from the mail. 18 U.S.C. § 1708. Chamberlin contended that the stop and arrest were unlawful and moved to suppress all statements and evidence obtained as a result of the stop and arrest. The motion was followed by a hearing at which Officer Morse and other witnesses testified. The district court noted that this was a close case and denied the motion, holding that the stop was lawful under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court relied largely upon the Sixth Circuit case of *United States v. Pope*, 561 F.2d 663, (6th Cir. 1977), in which the flight of the accused upon the approach of an officer to question him was a major factor in the court's determination that reasonable suspicion for the *Terry* stop existed. The district court in the instant case did not focus upon the question of the lawfulness of the detention in the patrol car subsequent to the investigatory stop and prior to the interview with the employees of the furniture store. It should be noted that the district court did not then have the benefit of the Supreme

Court's recent ruling in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which bears heavily upon this question.

### Discussion

· We first examine the two possible intrusions into rights protected by the fourth and fourteenth amendments: the stop and the subsequent detention.

■ 1. *The stop.* When Officer Morse first observed Chamberlin and Franklin, he knew that both men had criminal records. He also observed that when these two men noticed him, both men looked worried and quickened their pace. A minute later while watching the two men for the second time, Officer Morse observed Franklin go between two houses, look toward him, and begin to run. Chamberlin also attempted to flee. As the trial judge correctly noted, the flight of both men is a crucial fact which justified the investigatory stop. Under all these circumstances, Officer Morse was justified in making an investigatory stop of Chamberlin under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1]

2. *The subsequent detention.* The detention in this case must be analyzed in light of the Supreme Court's recent decision of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, Rochester police suspected that the defendant had killed the proprietor of a pizza parlor in Rochester, N.Y., but did not have probable cause to get a warrant for his arrest. The police officers took the defendant from a neighbor's house, seated him in a police car, transported him to the police headquarters, and placed him in an interrogation room. Although the defendant was not told he was under arrest, he would have been physically restrained if he had attempted to leave. After giving the defendant his *Miranda* warnings, the officers questioned the defendant. Defendant

waived counsel and eventually made statements and drew sketches that incriminated him in the crime.

The issue before the Supreme Court was whether the Rochester police violated the fourth and fourteenth amendments when, without probable cause to arrest, they took the defendant into custody, transported him to the police station, and detained him there for interrogation. The Court stated:

> The Fourth Amendment, applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides: The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . . There can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station.

*Dunaway*, 99 S.Ct., at 2253. The Court then noted: "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Dunaway*, 99 S.Ct. at 2253 n.6, quoting from *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

The Court in *Dunaway* carefully analyzed the distinction between the seizure of a person for purposes of arrest, which requires probable cause, and the more limited seizure of a person by a brief investigatory stop, which requires merely reasonable suspicion. The Court rejected the suggestion of a multifactor balancing test of "reasonable police conduct under the circumstances." It emphasized that the *Terry* stop was a narrow exception and was not to be extended so as to erode the long prevailing standards of probable cause. The Court stated:

---

1. California law governing brief investigatory stops is the same as the federal law. *See In Re Tony C.*, 21 Cal.3d 888, 893–95, 582 P.2d 957, 959–61, 148 Cal.Rptr. 366, 368–70 (1978). The stop in this case was made by a state officer. We find that the investigatory stop was proper under both state and federal standards, and thus, need not reach the question which would be posed were the state standard more restrictive. *See United States v. Orozco*, 590 F.2d 798, 792 n.1 (9th Cir. 1979); *United States v. Grajeda*, 587 F.2d 1017 (9th Cir. 1978).

A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proven protections afforded by the general rule, is reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

*Dunaway*, 99 S.Ct. at 2257.

The Court stressed that a lesser standard than probable cause was not to be applied merely because the seizure occurred during an investigative stage rather than an accusatory stage. In quoting from *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969) the Court stated:

"[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'"

*Dunaway*, 99 S.Ct. 2257.

The *Terry* case involved a limited on–the–street stop and frisk for weapons. The Court in *Dunaway* traced the narrow application of the exception in subsequent cases. The Court pointed out in *Dunaway*, 99 S.Ct. at 2256–57 that *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), applied the *Terry* exception to roving border patrols stopping automobiles to check for illegal immigrants where the stop was for less than a minute and involved only a brief question or two. However, as the Court noted, *Brignoni–Ponce* refused to extend *Terry* to a generalized balancing test but had stated:

"The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" *Brignoni–Ponce*, 422 U.S. at 881–882, 95 S.Ct. at 2580. Accord, *United States v. Martinez–Fuerte, supra*, 428 U.S. 543, at 567, 96 S.Ct. 3074 at 3087, 49 L.Ed.2d 1116.

*Dunaway*, 99 S.Ct. at 2256–57.

The Court in *Dunaway* emphasized that for all but these narrowly defined intrusions, the longer detentions must be justified by the traditional requirement of probable cause. Probable cause exists where facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *Dunaway*, 99 S.Ct. at 2254 n.9.

 As we have noted, there were sufficiently specific articulable facts upon which to base a reasonable suspicion that criminal activity was afoot when Chamberlin was stopped. This would be sufficient to justify a brief stop and a few brief questions. However, there was not probable cause then or after the brief questioning to justify a more extensive detention. Chamberlin was held in the back of the patrol car for twenty minutes while the police officer attempted to locate Robert Franklin and continue his investigation. There is no doubt that this was reasonable, good faith police work on the part of the officer. He was obviously attempting to retain custody of Chamberlin until he could locate Franklin to question them both. The government argues that this detention was justified by the necessities of the circumstances and the good faith actions of the police officer. This, however, is the very balancing approach that the Supreme Court rejected in

*Dunaway.* It is true that the fact situation in *Dunaway* constituted a more flagrant unlawful detention, because the police, without probable cause, went out to pick up the accused rather than encountering him in suspicious circumstances, and not only placed him in the patrol car, but took him to the police station. This case certainly constitutes a lesser intrusion on Chamberlin's liberty. However, this is a significantly greater intrusion than the brief *Terry* stop.

Here, Chamberlin was not questioned briefly where he was found. He was placed in the back seat of a police car for twenty minutes. While in the police car, Officer Morse observed his demeanor and questioned him. He was never informed that he was free to leave the car. In fact, Officer Morse admitted that once he detained Chamberlin, he was not free to go. Officer Morse also admitted that he detained Chamberlin "to find out what was going on." Therefore, we conclude that the twenty-minute detention of Chamberlin constituted a "detention for custodial interrogation" within the meaning of *Dunaway v. New York*, requiring probable cause for justification.[2] We accordingly hold that this detention violated Chamberlin's fourth and fourteenth amendment rights.[3]

The final question is whether the statements made by Chamberlin after he was ordered into the police car, the observations of Chamberlin at that time, and ultimately the identification of Chamberlin at the furniture store, were fruits of the unlawful seizure. In *Wong Sun v. United States*, the Supreme Court stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, *Evidence of Guilt,* 221 (1959).

*Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

■ In order to determine whether the statements, the observations of Chamberlin and the ultimate identification are fruits of the illegal detention, a brief review of the facts is necessary. When Officer Morse initially stopped Chamberlin, he asked Chamberlin two questions. Officer Morse asked Chamberlin what he was doing; Chamberlin responded that he had just returned from paying his mother's furniture bill at the Universal Furniture Store. Officer Morse also asked why Robert had run away; Chamberlin responded that he did not know any Robert. Both statements were made prior to placing Chamberlin in the police car while Officer Morse was still engaging in a *Terry* investigatory stop.[4] The investigatory stop was justified under the circumstances; thus, neither of these statements was the product of illegal activity.

Five minutes after placing Chamberlin in the police car, Officer Morse received a radio message that a check had been found near the point of Chamberlin's apprehension. After retrieving the check, Officer Morse observed Chamberlin's nervous demeanor. Officer Morse than reinquired as

---

**2.** The limits of the *Terry*-type exception, when a balancing approach may be used, is subject to delineation in future cases, *see United States v. Perez–Esparza,* 609 F.2d 1284, 1287 n.2 (9th Cir. 1980). We note that *Dunaway* emphasizes that the exception is a narrow one.

**3.** Since we find the detention violative of the federal Constitution, we need not reach the propriety under state law of the detention. *See United States v. Thompson,* 597 F.2d 187, 190 n.6 (9th Cir. 1979).

**4.** For purposes of this analysis we shall take the facts as found by the district judge at the suppression hearing. The district judge found that the initial statement by Chamberlin about the furniture store was before he was placed in the patrol car. However, the stipulated facts presented at trial indicate that the initial statement by Chamberlin that he had just been to the furniture store was after he had been placed in the patrol car.

to Chamberlin's statement regarding paying his mother's furniture bill at the Universal Furniture Store. Chamberlin responded by disclaiming that he had made such a statement. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court dealt with the question of whether statements given by the defendant while illegally detained in custody were fruits of the illegal detention, and thus to be suppressed under the exclusionary rule. In *Dunaway*, the Court further interpreted the *Brown* holding as applied to statements and sketches given by defendant Dunaway while in custody after an unlawful arrest. The Court stated:

> *Brown* articulated a test designed to vindicate the "district policies and interests of the Fourth Amendment." Following *Wong Sun* the court eschewed any *per se* or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest." *Brown's* focus on "the causal connection between the illegality and the confession" reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

*Dunaway*, 99 S.Ct. at 2259 (citations omitted).

■ The three factors identified in *Brown* pertain particularly to statements or evidence which have been acquired from the defendant himself to determine whether there has been a sufficient attenuation or break in the causal chain to justify the use

of the evidence.[5] In this case, because we have determined that the detention of Chamberlin was unlawful, and the questioning of him after he was held in the police car was "custodial interrogation," it is clear that the statement made must be suppressed under the fifth amendment since no *Miranda* warnings were given. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *United States v. Kennedy*, 573 F.2d 657, 660 (9th Cir. 1978). Therefore, we need not consider whether the three *Brown* factors apply so as to preclude the use of Chamberlin's statement disclaiming his prior comment about the furniture store, because we do not get beyond the threshold fifth amendment question. *See Dunaway*, 99 S.Ct. at 2259; *United States v. Perez–Esparza*, 609 F.2d 1284, 1289 (9th Cir. 1980).

■ We next consider whether the police officer's observations of Chamberlin's nervous demeanor must be excluded as fruit of the illegal seizure. It is apparent that the opportunity to observe his demeanor was brought about only because of his illegal detention, and thus must be excluded as an exploitation of his illegal arrest. *Dunaway*, 99 S.Ct. at 2259.

■ Finally, we consider the evidence of the identification of Chamberlin and the check at the furniture store. It was only after Officer Morse observed Chamberlin's nervous demeanor and Chamberlin had made the disclaimer, that Officer Morse decided to go to the Universal Furniture Store. After arrival at the store, the employees identified the check as being the same check that Chamberlin had tried to cash earlier. The information available to Officer Morse which was obtained independent of the illegal detention can be summa-

---

5. We discussed these factors in *United States v. Perez–Esparza*, 609 F.2d 1284, 1289 (9th Cir. 1980) stating:

> The Court in *Brown v. Illinois, supra*, announced three factors for courts to consider, beyond the threshold Fifth Amendment question of voluntariness, in determining whether a putative defendant's inculpatory statements subsequent to an illegal arrest must be

excluded. These factors are: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . .." *Brown v. Illinois, supra*, 422 U.S. at 603–04, 95 S.Ct. 2254, 2262, *quoted in Dunaway v. New York, supra*, 99 S.Ct. at 2259.

rized as follows: Officer Morse observed Chamberlin acting suspiciously. Chamberlin had attempted to flee while Officer Morse was observing him for a second time. Chamberlin stated that he had just come from paying his mother's bill at the Universal Furniture Store. A check was subsequently found near the location of Chamberlin's attempted flight. The information available to Officer Morse which was obtained as a direct result of the illegal detention can be summarized as follows: After the officer retrieved the check, Chamberlin became very excited, began to sweat and appeared very nervous. Chamberlin denied making any statements about having been at the Universal Furniture Store. We must determine under the *Wong Sun* test whether this evidence was obtained by "exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417. The focus is on the causal connection between the illegality and the evidence; and, the burden of showing admissibility rests on the prosecution. *Dunaway*, 99 S.Ct. at 2259. In this circuit, we have stated the test to be whether the illegal activity tends to significantly direct the investigation to the evidence in question. *United States v. Cales*, 493 F.2d 1215 (9th Cir. 1974), *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). There is no doubt that the observation of Chamberlin's excited condition and nervousness, together with his statement that he had not previously mentioned the furniture store, added considerable impetus to the investigation, and tended significantly to direct the investigation to the furniture store. Thus, we hold that the identification evidence must be excluded as fruit of the unlawful detention.

We conclude that Officer Morse's observation as to Chamberlin's nervous demeanor, Chamberlin's statement that he did not mention having been at the Universal Furniture Store, and the identification made by the Universal Furniture Store employees are fruits of the unlawful detention and should have been suppressed.

Reversed and remanded.

CHOY, Circuit Judge, concurring and dissenting:

Because of the Supreme Court's strongly-couched dicta in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), I agree with my colleagues that the detention of Chamberlin after the initial investigatory stop was illegal.

However, I respectfully dissent from my colleagues' conclusion that all the evidence derived by the officer after the placement of Chamberlin in the back seat of the police car was tainted by the illegal detention and therefore must be suppressed as the fruit of a poisonous tree.

My colleagues find that the officer's initial observation of Chamberlin's suspicious behavior, Chamberlin's first statement about the Universal Furniture Store, and his statement regarding Franklin were completely untainted. All this evidence was obtained before the illegal detention.

But I wish to point out that the officer's receipt of the radio message and his discovery that the check belonged to a third person, rather than to Chamberlin's mother, were also untainted, because they had no connection with the illegal detention. The information in the officer's possession at that moment made him suspicious of Chamberlin's earlier reference to the furniture store. Even if Chamberlin had been released before, the officer would have proceeded directly to the furniture store, where he would have obtained (without any hint of illegality) the evidence that was used to convict Chamberlin.

Since in fact the officer had Chamberlin in detention when the properly discovered facts pointed him toward the furniture store, he engaged him in further dialogue about the furniture store and observed his nervousness and sweating. This evidence was the fruit of the illegal detention; however, it was not the source of the evidence obtained at the furniture store. The ille-

gally–obtained evidence merely buttressed a determination, based on undeniably legal evidence, that the officer had already made.

When reviewing refusals to suppress evidence, we view the facts in the light most favorable to the Government's position. *E. g., United States v. Sherman*, 430 F.2d 1402, 1404 (9th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805 (1971). I believe that the facts that emerge under such a view compel a result different from that which my colleagues have reached. *See United States v. Brandon*, 467 F.2d 1008, 1010–11 (9th Cir. 1972).

I would affirm the conviction.