**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Randall G. PRIM, Defendant-Appellant.**

**No. 81–1149.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 16, 1981.

Decided Feb. 7, 1983.

Before HUG and ALARCON, Circuit Judges, and TAKASUGI,* District Judge.

TAKASUGI, District Judge:

Defendant Randall G. Prim appeals his conviction for possession of cocaine in violation of 21 U.S.C. § 844. He challenges the trial court's denial of his motion to suppress.

## FACTS

On October 7, 1980, at approximately 9:00 a.m., defendant arrived at the Portland International Airport in Portland, Oregon and purchased, with cash, a one-way ticket to Hilo, Hawaii, via Honolulu, scheduled for departure at 9:30 a.m. that date. He checked in a blue suitcase and hand-carried a black briefcase. Upon defendant's arrival at the airport, he was observed by Patrolman Battaglia of the Port Authority of Portland Police Department and Sergeant Wells of the Multnomah County Sheriff's Department. Battaglia became suspicious of defendant because of the way he looked around. Drug Enforcement Administration ("DEA") Special Agent Gutensohn was contacted and he placed defendant under surveillance for approximately two hours until defendant's delayed flight finally boarded at approximately 11:00 a.m. During his surveillance, he noticed defendant's nervous movements, such as looking around every 15 yards and changing directions in walking. After defendant's departure, Gutensohn checked with NADDIS, a listing of narcotics investigations, which revealed that defendant was mentioned in a 1979 narcotics investigation.

Before 12:00 noon, Battaglia made a telephone call to DEA Special Agent Jerome Snyder of the Honolulu International Airport Task Force and provided him with defendant's name, flight number, physical

Brook Hart, Hart & Wolff, Honolulu, Hawaii, for defendant-appellant.

Emilia M. DeMeo, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

* The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

description and description of defendant's suitcase and briefcase. He also mentioned the NADDIS report and defendant's nervous movements at the Portland International Airport. At 1:00 p.m., Battaglia telephoned Snyder again and informed him of an outstanding nonsupport warrant for defendant issued out of Lane County, Oregon. Both of these telephone calls were made before defendant's arrival in Honolulu.

At approximately 2:00 p.m. Hawaii Standard Time ("HST"), Snyder, together with Agents Kempshall and Tanaka and Honolulu Police Department Officer Abe, observed defendant deplane. Abe followed defendant into a bathroom, and thereafter toward the interisland terminal where he was to continue his flight from Honolulu to Hilo. Apparently there was nothing unusual or suspicious about defendant's actions during this period of observation.

Before reaching the interisland terminal, defendant was approached by Abe who placed his hand on defendant's shoulder, identified himself and displayed his badge. Abe asked defendant to produce his identification and his airline ticket. Either shortly before or after this request by Abe, the two were joined by Kempshall, who also showed his identification. Abe and Kempshall both examined defendant's identification and ticket and found them to be in order.

Abe then informed defendant of their suspicion that defendant might be trafficking in narcotics and asked, "Would you like to accompany me to the office?" Whereupon, Abe put his hand on defendant and pointed the way. Kempshall used a different route to the office. No mention was then made of the outstanding nonsupport warrant. Snyder met Abe and defendant just before they arrived at the office and accompanied them. The office was located approximately 100 yards from the point where defendant was initially stopped by Abe. In the meantime, Tanaka had obtained defendant's blue suitcase. Defendant was brought into an interrogation room adjoining the DEA office at approximately 2:30 p.m. HST.

At the suppression hearing, Snyder, Abe and Kempshall testified that, although they were all aware of the outstanding nonsupport warrant, the reason for the relocation and detention of defendant was that they suspected him of trafficking in narcotics, not because of the outstanding warrant. Abe further testified that the purpose for the relocation was to interrogate defendant and obtain his consent to a search.

In the interrogation room, defendant was twice asked by Snyder for his consent to a search of his person and his bags. Defendant refused on both occasions. Defendant and Abe testified that defendant thereafter requested a lawyer. Following defendant's refusal to a consensual search, Snyder told defendant to empty his pockets in preparation for a pat-down for weapons. Whereupon, defendant removed his keys and other personal items from his pockets and placed them on a table before him. He did not remove an opaque envelope which made a bulge in his left front pocket. The envelope was later found to contain cocaine. Snyder performed the pat-down search, felt the envelope and directed defendant to remove it. Defendant thereupon removed the envelope and placed it on the table with his personal items. Snyder then advised defendant of his *Miranda* rights. (According to Snyder's testimony, defendant requested a lawyer only after Snyder had advised him of his *Miranda* rights.) Abe then entered with a consent to search form, which defendant declined to sign.

Snyder testified that defendant thereafter requested a cigarette from his briefcase. Responding to the request, Snyder opened the briefcase, removed a cigarette, placed all of the items from defendant's pockets, including the envelope of cocaine, into the briefcase, and closed the briefcase. Defendant testified that he does not smoke and never requested a cigarette.

After placing all of the items into the briefcase, Snyder took the briefcase out of the interrogation room. Snyder then locked or shut the door, leaving defendant alone in the interrogation room.

Snyder talked with Kempshall about securing a narcotics detector dog and about the Oregon nonsupport warrant. Snyder testified that he knew there was an outstanding warrant but that it had not yet been verified.

At approximately 3:20 p.m. HST, a narcotics detector dog was directed to defendant's suitcase and briefcase and the dog alerted in a positive manner. An hour later a second dog was summoned and that dog reacted in like fashion. The parties stipulated to the extremely high degree of reliability of the two dogs in responding to narcotics.

After the first dog alerted, Kempshall returned to the interrogation room and formally arrested defendant.

On October 8, 1980, a search warrant was issued upon the affidavit of Kempshall. Upon opening defendant's suitcase and briefcase, the envelope containing the cocaine, originally in defendant's pocket, was seized from defendant's briefcase.

Snyder, upon cross-examination, testified that there was a point in time, prior to the formal arrest, when defendant was no longer free to leave, the time being when he first made contact with defendant in the interview room following defendant's first refusal to a consensual search.

The lower court denied defendant's motion to suppress and defendant was convicted for possession of cocaine in violation of 21 U.S.C. § 844.

## DISCUSSION

Defendant does not contest on appeal the validity of the initial stop. Instead, defendant contends that his removal to the DEA interrogation room was an arrest without probable cause and further claims that defendant was detained for no other purpose than to conduct a custodial interrogation and to obtain consent to search his person and property.

Although the existence of reasonable suspicion or probable cause is judicially viewed under an objective standard, it is a standard applied to the actual and/or perceived belief of the law enforcement officer as he either stops and detains or engages in search and seizure. It is this conceptual application that the dissent fails to consider. Further, contrary to what the dissent suggests, no effort is advanced to base probable cause for arrest on the subjective state of mind of the arresting officer.

An examination of the transcript of the suppression hearing clearly establishes that all of the officers involved in the stop, detention, interrogation and search request did so only upon their suspicion that defendant was a drug trafficker. It was not because of the outstanding nonsupport warrant.

Accordingly, the nonsupport warrant was not the cause of the officers' action and thus not the cause to which the objective standard should be applied. For this reason, the trial court's reliance upon the nonsupport warrant to justify probable cause is clearly erroneous. If anything, it provides a pretext after the fact to justify the officers' actions. Such pretextual use to justify an arrest or search has been clearly recognized as violative of the fourth amendment. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976); *Brown v. Illinois,* 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring); *Wainwright v. City of New Orleans,* 392 U.S. 598, 606–607, 88 S.Ct. 2243, 2249–50, 20 L.Ed.2d 1322 (1968) (Warren, C.J. dissenting).

Finally, the dissent seems to suggest that this court view the actions of the law enforcement officers under the standard of good faith as an exception to the exclusionary rule. If this is a prognostication, it is still not the law. See *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).

The Government contends that defendant voluntarily consented to accompany the officers to the DEA office and therefore his relocation did not constitute an arrest, citing *United States v. Mendenhall,* 446 U.S.

544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *Mendenhall* involved an initial stop of a deplaning passenger in an airport and a subsequent relocation of the passenger to the DEA office for further questioning. After holding the initial stop to be proper, the Court proceeded to validate the relocation of the passenger, holding that the evidence was sufficient to support the district court's finding that the passenger voluntarily consented to accompany the DEA officers.

Since *Mendenhall* affirmed the finding of consent, the Court was not addressing the issue of whether there was sufficient cause for the relocation, absent consent. In the instant case, contrary to the Government's contentions, the district court has not found consent.

In *United States v. Chatman,* 573 F.2d 565 (9th Cir.1977), this Circuit held that only a founded suspicion based on facts known to the agent was needed to justify a brief interrogation and that "it was not improper, in absence of protest or coercive circumstances, to arrange that it take place free from public view with its attendant embarrassment." 573 F.2d at 567.

*Chatman* has been severely limited by *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), wherein the Supreme Court addressed the relocation of a suspect to police headquarters for custodial interrogation. The court held "that detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest [requiring probable cause]." 442 U.S. at 216, 99 S.Ct. at 2258. The Court cited *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as a very limited exception to the requirement of probable cause for seizures, and noted that *Terry* itself involved a limited on-the-street frisk for weapons. In a footnote, the Court in *Dunaway* further stated that "*Terry* specifically declined to address 'the constitutional propriety of an investigative "seizure" upon less than probable cause for purposes of

"detention" and/or interrogation'." 442 U.S. at 210, n. 12, 99 S.Ct. at 2255, n. 12. The Court further analyzed the distinction between a fourth amendment seizure requiring probable cause and a brief investigatory stop which requires only reasonable suspicion but "usually [consumes] less than a minute and [involves] 'a brief question or two'," 442 U.S. at 210–211, 99 S.Ct. at 2255, and rejected the suggestion of employing a balancing test which would permit seizures for custodial interrogation on the basis of reasonable suspicion. The Court stated:

> In effect, respondent urges us to adopt a multifactor balancing test of "reasonable police conduct under the circumstances" to cover all seizures that do not amount to technical arrests. But the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 [68 S.Ct. 367, 369, 92 L.Ed. 436] (1948). A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test [i.e., *Terry* and its progeny]. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

442 U.S. at 213–214, 99 S.Ct. at 2257 (footnotes omitted).

Since the Supreme Court's decision in *Dunaway,* the Ninth Circuit has addressed the issue of a detention with conflicting

results. *United States v. Post,* 607 F.2d 847 (9th Cir.1979). *United States v. Chamberlin,* 644 F.2d 1262 (9th Cir.1980).

In *Post,* this circuit held an initial stop to be justified upon founded suspicion and then proceeded to distinguish *Dunaway* and follow *Chatman* in validating the relocation of a suspect to an airport interview room. The distinction made was that in *Post* and *Chatman* the lower court made no finding on defendant's voluntariness in being relocated, while in *Dunaway* there was a finding of involuntariness. However, this is a distinction without a difference since regardless of which standard is applied— probable cause or founded suspicion—it would be applied to determine the constitutionality of the relocation only when there is no consent. As such, *Post* provides no plausible reason for not following the *Dunaway* standard in testing the constitutionality of a detention.

In *Chamberlin,* a suspect was placed alone in the back seat of a police car for 20 minutes while the officer searched for the suspect's companion. The suspect was so detained because the officer wished to question him to determine what was going on. This Court, in reversing the district court, found the detention to be a "detention for custodial interrogation," within the meaning of *Dunaway* and, therefore, requiring probable cause to justify it. 644 F.2d at 1267.

■ Even if the relocation were constitutional, continued detention after defendant's first refusal to consent to a search constituted a custodial interrogation without probable cause under the reasoning of *Dunaway* and *Chamberlin.* As such, the government had no justification for conducting a pat-down search thereafter, and the cocaine taken from defendant was thereby tainted by the illegal detention and should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Furthermore, a pat-down search is "to allow the officer to pursue his investigation without fear of violence..." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra,* 392 U.S. at 29, 88 S.Ct. at 1884; and the scope therefore is limited to a search for guns, knives, clubs or other hidden instruments for assault. *Tinney v. Wilson,* 408 F.2d 912 (9th Cir.1969).

■ Here, it appears Snyder really expected to find narcotics as the source of the bulge, and used the pat-down as a ruse. Defendant passed through a magnetometer, was under constant surveillance at the Portland airport, and was under constant surveillance at the Honolulu airport by Abe. Both Abe and Kempshall testified that nothing about defendant's behavior indicated that he was armed or dangerous. That testimony is compatible with the fact that neither Abe nor Kempshall conducted a pat-down search. Based on the information from Portland, the bulge in defendant's pocket and defendant's first refusal of the requested search in the interrogation room, Snyder testified that he believed there was probable cause to further detain defendant for narcotics investigation. Similarly, in the court below, the government argued that Snyder's observations of the bulge added to his suspicion that defendant was in possession of narcotics. Furthermore, a pat-down is usually conducted immediately when an officer comes in contact with a person whom the officer justifiably believes may be armed and dangerous, which was not the case with Snyder. These facts suggest that the whole objective of the pat-down was not aimed at a weapons search to protect against danger as permitted under *Terry,* but instead was conducted with the expectation of finding narcotics. Therefore, there was no justification for a pat-down and the pat-down conducted exceeded the permissible scope of a weapons search. See *United States v. Del Toro,* 464 F.2d 520 (2nd Cir.1972). Thus, the manila envelope was seized as a result of an illegal pat-down and should have been suppressed.

Defendant further contends that the use of narcotics-detecting dogs was an illegal search of defendant's bags. This question has already been raised and answered by

this circuit in *United States v. Solis,* 536 F.2d 880 (9th Cir.1976), and *United States v. Beale,* 674 F.2d 1327 (9th Cir.1982). However, since we find the detention and the pat-down illegal, we need not reach this issue.

REVERSED.

HUG, Circuit Judge, concurring:

I concur in the result, for one of the reasons expressed by Judge Takasugi:

> Even if the relocation were constitutional, continued detention after defendant's first refusal to consent to a search constituted a custodial interrogation without probable cause under the reasoning of *Dunaway* and *Chamberlin.* As such, . . . the cocaine taken from defendant was thereby tainted by the illegal detention and should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

I find it unnecessary to examine the more ambiguous earlier events or the later events which were obviously tainted by the illegal detention.

The district court and the dissent characterize the detention as a valid arrest because of the outstanding Oregon arrest warrant for nonsupport. I disagree. The DEA agents who arrested Prim did not have federal statutory authority to arrest on state charges. *See* 21 U.S.C. § 878. Like other special federal law enforcement officers, DEA "agents are not general guardians of the public peace, as are state or local police. Their powers to search places and to search and arrest persons are limited by statute." *United States v. Diamond,* 471 F.2d 771, 773 (9th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2751, 37 L.Ed.2d 161 (1973); *see also United States v. Watson,* 423 U.S. 411, 415–16, 96 S.Ct. 820, 823, 46 L.Ed.2d 598 (1976) (postal inspectors); *United States v. Harrington,* 681 F.2d 612, 613 (9th Cir.1982) (Customs Service); *United States v. Soto-Soto,* 598 F.2d 545, 549 (9th Cir.1979) (FBI agents); *United States v. Thompson,* 475 F.2d 1359, 1362–63 (5th Cir.1973) (border patrol). I do not believe these express limitations of enforcement officers' authority can be avoided merely by invoking state statutes permitting warrantless arrests by private persons. If federal agents could resort to such state statutes in every instance, the federal statutory limitations would be meaningless. Therefore, I cannot conclude, in view of the nature of the felony involved in the Oregon warrant, that DEA agents were clearly authorized by the warrant to arrest Prim.

Even assuming that such authority could exist, the record does not support the conclusion that the warrant was the basis for Prim's detention. The Government does not contend that the DEA agents' intended purpose in detaining Prim was to execute the outstanding warrant. The admitted purpose of the detention was to investigate a possible narcotics violation. Reliance on the warrant appears to be an after-the-fact justification of a search for which no probable cause existed. An arrest may not be used as a pretext to search for evidence of an unrelated crime. *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *Williams v. United States,* 418 F.2d 159, 161 (9th Cir.1969), *aff'd* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). "To put it in other words, the *search* must be incident to the *arrest,* and not vice versa." *Taglavore v. United States,* 291 F.2d 262, 265 (9th Cir.1961) (emphasis in original).

The dissent asserts that the DEA agents' subjective motivation is not relevant to this inquiry. However, we have held that the arresting officers' motivation is relevant when the arrest is alleged to be a mere pretext for an unauthorized search. *See Williams,* 418 F.2d at 161, and cases cited therein; *Taglavore,* 291 F.2d at 265. Because the agents' statements indicate that their only motivation was investigation of a narcotics violation, I conclude that the search and seizure were not the products of a valid arrest.

ALARCON, Circuit Judge, dissenting:

I respectfully dissent.

I would affirm the judgment.

The district court found that no fourth amendment violation occurred at the time of the detention, arrest, and search of Prim based, inter alia, on the fact that there was an outstanding warrant for his arrest.

The evidence of the existence of an outstanding arrest warrant was uncontradicted. No question was raised below as to the validity of the warrant. Specifically, no issue of law or fact was presented to the district court as to whether Special Agent Snyder had the authority to make an arrest pursuant to the outstanding warrant.

It is also undisputed that under Hawaiian law Special Agent Snyder and Honolulu Police Officer Abe were authorized to arrest Prim based on the outstanding Oregon warrant of arrest.

Hawaii Rev.Stat. § 832–14 provides as follows:

Arrest without a warrant. The arrest of a person may be lawfully made also by any peace officer or *a private person,* without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year. . . . (emphasis added).

No question has been raised as to the legal meaning of the term "reasonable information" or whether the facts presented to the district court meet this standard. I believe that a proper construction of the Hawaii statute consistent with the requirements of the fourth amendment would be to equate "reasonable information" with probable cause. No challenge has been made concerning the constitutionality of section 832–14.

The undisputed facts show that Special Agent Snyder received information of the outstanding Oregon warrant through official police channels from Patrolman Battaglia of the Port Authority of Portland Police Department.

The fact that Special Agent Snyder may not qualify as a "peace officer" under Hawaiian or federal law is immaterial in view of his power to make an arrest as a private person under section 832–14.

Thus, the facts known to Special Agent Snyder *prior to the search* established probable cause to arrest. The fourth amendment requires no greater proof. The United States Supreme Court has held that where an officer has probable cause to arrest, no additional justification is required for a search of a person and his effects. *See, e.g., Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The Supreme Court stated the rule as follows:

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires *no additional justification.* It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that amendment.

*Id.* at 235, 94 S.Ct. at 477 (emphasis added).

Thus, pursuant to the applicable Hawaiian law of arrest, DEA Special Agent Snyder and Honolulu Police Officer Abe were authorized to detain and arrest Prim based on the outstanding Oregon warrant. Under *Robinson* they were authorized to search his person and his briefcase for narcotics without further justification. *See also Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

Judge Takasugi has concluded that the district court's reliance on the outstanding warrant was clearly erroneous because: "The nonsupport warrant was not the cause of the officer's action and thus not the cause to which the objective standard should be applied." *Ante* 698 F.2d at 975.

Judge Takasugi has cited no authority for the novel proposition that a law enforcement officer or a private person who has probable cause to arrest and search a person, based on an outstanding warrant, acts unreasonably if his subjective motivation to

make an arrest and to search another is based on additional factors which do not, standing alone, justify an arrest.

The curious result of the majority's determination of this case can be stated as follows: If a law enforcement officer has facts within his knowledge which constitute probable cause to arrest, he violates the fourth amendment if he mistakenly believes that he lacks authority to make an arrest unless he obtains additional facts. The majority has apparently concluded that, under the law of search and seizure, the total is equal to less than the sum of its parts. Stated in equation form, the majority suggests that facts establishing probable cause to arrest plus additional facts not amounting to probable cause equal an absence of probable cause, or $2x + 1x = 1x$.

Contrary to the majority's conclusion, probable cause for arrest cannot be based on the *subjective* state of mind of the arresting officer. The Supreme Court has recently stated this principle as follows:

Moreover, the probable cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers.

*United States v. Ross,* 456 U.S. 798, 808, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982).

The objective facts before the district court established reasonable cause to arrest on the basis of the outstanding warrant. The state of mind of the officer at the time Prim was first detained, was not legally relevant in determining if the objective facts demonstrated probable cause. The majority has seized upon a portion of the officers' testimony—*i.e.,* an in-court reconstruction of their stream of conciousness at the time Prim was apprehended—and has ignored the objective facts which clearly justified the officer's conduct under the fourth amendment. Apparently the majority would have reached a different result if the officers had testified falsely that they were motivated solely by their knowledge of the existence of the outstanding warrant. The result of the majority opinion is to punish the honest and conscientious law enforcement officer who refrains from invading the privacy of another until he has completed his investigation, in spite of objective facts which would justify an earlier arrest, and to reward a more casual or less candid officer, who would arrest on minimally adequate objective facts, without seeking additional corroboration or incriminating information. This cannot be the law.

In justifying their conclusion that the district court must be reversed, Judge Hug and Judge Takasugi have informed us in separate opinions that an arrest may not be used as a mere pretext for an unauthorized search. This of course has been the law for many years. There is no evidence in this record, however, to show that the officers were guilty of pretextual conduct. It is distressing to me that the issue of pretext has been needlessly interjected in a case where the record demonstrates that the officers acted in complete good faith in doing their job and exhibited great sensitivity in choosing the least intrusive means of interfering with the rights of an individual under suspicion. The suggestion that this record somehow justifies a discussion of pretext is a gratuitous overkill of little value in resolving the issues raised by the parties.

The fourth amendment proscribes unreasonable law enforcement conduct. It has no application to official acts which are reasonable and respectful of individual privacy. In the matter before this court, the officers, in spite of their knowledge of facts which would have justified an immediate and embarrassing arrest and search in an international airport, chose instead, to make a quiet and discreet request of Prim in the hope that he would consent to a search. I would applaud, not condemn, their conduct.